# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 16-0994

THOMAS I. LYLES, JR., APPELLANT,

V.

DAVID J. SHULKIN, M.D.,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued August 17, 2017                           Decided November 29, 2017)

*Christian A. McTarnaghan*, of Providence, Rhode Island, for the appellant.

*Megan C. Kral*, with whom *Leigh A. Bradley*, General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Edward V. Cassidy, Jr.*, Deputy Chief Counsel, all of Washington, D.C., were on the brief for the appellee.

Before DAVIS, *Chief Judge*, and BARTLEY and GREENBERG, *Judges*.

BARTLEY, *Judge*: Veteran Thomas I. Lyles, Jr., appeals through counsel a January 14, 2016, Board of Veterans' Appeals (Board) decision denying entitlement to a separate disability evaluation for service-connected left knee disability based on locking or other manifestations of the semilunar cartilage.[1] Record (R.) at 2-19.[2] This matter was referred to a panel of the Court, with oral argument, to address the interplay between 38 C.F.R. § 4.71a, Diagnostic Codes (DCs) 5257 (Other impairment of the knee: recurrent subluxation[3] or lateral instability), 5258 (Dislocated semilunar cartilage with frequent episodes of "locking," pain, and effusion into the joint), 5259

---

[1] Semilunar cartilage, in this context, refers to the knee menisci. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 299 (32d ed. 2012) [hereinafter DORLAND'S].

[2] The Board also denied entitlement to increased left knee evaluations based on limitation of extension before and after April 22, 2010, and a separate evaluation based on limitation of flexion. R. at 13-17. Because Mr. Lyles has not challenged those portions of the Board decision, the appeal as to those issues will be dismissed. *See Pederson v. McDonald*, 27 Vet.App. 276, 281-85 (2015) (en banc) (declining to review the merits of an issue not argued on appeal and dismissing that portion of the appeal); *Cacciola v. Gibson*, 27 Vet.App. 45, 48 (2014) (same). In addition, the Board remanded the issue of entitlement to an extraschedular evaluation for service-connected left knee disability. R. at 4, 18-19. Because a remand is not a final decision of the Board subject to judicial review, the Court does not have jurisdiction to consider the remanded issue at this time. *See Howard v. Gober*, 220 F.3d 1341, 1344 (Fed. Cir. 2000); *Breeden v. Principi*, 17 Vet.App. 475, 478 (2004) (per curiam order); 38 C.F.R. § 20.1100(b) (2017).

[3] Subluxation is "an incomplete or partial dislocation." DORLAND'S at 1791.

(Semilunar cartilage removal, symptomatic), and 5261 (Limitation of leg extension). The Court holds that evaluation of a knee disability under DCs 5257 or 5261 or both does not, as a matter of law, preclude separate evaluation of a meniscal disability of the same knee under DC 5258 or 5259, and vice versa. The Court further holds that entitlement to a separate evaluation in a given case depends on whether the manifestations of disability for which a separate evaluation is being sought have already been compensated by an assigned evaluation under a different DC. In the context of evaluating musculoskeletal disabilities based on limitation of motion, a manifestation of disability has not been compensated, for separate evaluation and pyramiding purposes, if that manifestation did not result in an elevation of the evaluation under 38 C.F.R. §§ 4.40 and 4.45 pursuant to the principles set forth in *DeLuca v. Brown*, 8 Vet.App. 202 (1995).

Accordingly, for the reasons that follow, the Court will reverse the Board's finding that the veteran's pain and swelling associated with his left knee meniscal disability were compensated by his 30% evaluation under DC 5257, set aside the portion of the January 2016 Board decision denying entitlement to a separate left knee evaluation based on locking or other manifestations of the semilunar cartilage, and remand that matter for further development and readjudication consistent with this decision.

## I. FACTS

Mr. Lyles served on active duty in the U.S. Army from March 1987 to July 1990. R. at 1399. He injured his left knee in service and, in January 1990, underwent a partial lateral meniscectomy with anterior cruciate ligament (ACL) reconstruction. *See* R. at 1381.

In August 1990, Mr. Lyles filed a claim for service connection for a left knee injury, R. at 1396; at the time, his chief complaint was instability, R. at 1381. In February 1991, a VA regional office (RO) granted service connection for left knee ACL tear with anterolateral instability and assigned a 10% evaluation under § 4.71a, DC 5257. R. at 1381-82. The RO subsequently increased the evaluation under that DC to 20% in March 1996 based on evidence of pain on walking and periodic "giving out," R. at 1350-51, and to 30% in July 1998 based on evidence of pain, swelling, weakness, and occasional "giv[ing] way," R. at 1233-34. The veteran did not appeal any of those decisions, and they became final.

The instant case stems from the veteran's April 2001 claim for an increased left knee evaluation, R. at 1185, which was denied by the RO in February 2002, R. at 1137-39, and has been

on appeal ever since, *see, e.g.*, R. at 3, 233-35 (Board's summaries of the procedural history of the claim).

During the course of the appeal, Mr. Lyles has undergone two partial lateral meniscectomies of the left knee—first in May 2005, R. at 1040-41, and again in November 2009, R. at 597-99. Pre- and post-operative medical records and lay statements reflect left knee pain, weakness, buckling, instability, swelling, locking, giving way, popping, stiffening, and grinding, which caused, inter alia, falls and limitation of left knee extension. R. at 414-15, 492-95, 497-98, 527, 551-55, 559-62, 566-67, 569, 597-98, 613-14, 618, 622, 625, 627, 629, 633, 636, 671-73, 695, 715, 806, 830, 833, 859, 878, 880, 1060, 1141, 1185.

Notably, at an April 2010 VA joints examination, Mr. Lyles reported that he experienced constant left knee pain that would increase to a 10 out of 10 during flare-ups. R. at 695-96. He indicated that he also suffered from left knee instability with giving way and that his left knee would frequently lock, resulting in a loss of 20 degrees of extension. R. at 695. On physical examination, he "lack[ed]" 20 degrees of active extension while seated and 15 degrees while lying down. R. at 697. The examiner noted pain and grimacing when he was passively extending the left knee and indicated that there was popping, grinding, and swelling throughout the range of motion. *Id.* The examiner remarked that there was no additional loss of motion due to pain, lack of endurance, fatigue, weakness, or incoordination on repetition, but stated that he was unable to comment on the extent of any additional functional loss during flare-ups without resort to speculation because the veteran was not experiencing a flare-up during the examination. R. at 703.

In December 2011, the Board continued the 30% evaluation for the left knee disability based on instability under DC 5257, exclusive of the periods that the veteran had been assigned a temporary total evaluation based on convalescence following the meniscectomies. R. at 463-81. The Board also awarded a separate 10% evaluation based on limitation of left knee extension under DC 5261 from October 12, 2001, to April 21, 2010, and a 30% evaluation thereafter. R. at 474. Mr. Lyles timely appealed to this Court, which, in October 2014, set aside the Board decision and remanded the case for readjudication because the Board had not adequately addressed whether the veteran was entitled to a separate left knee evaluation under DC 5258 or 5259. R. at 318.

The case was subsequently returned to the Board, which, in April 2015, remanded for additional development, including a new VA joints examination. R. at 231-40. Mr. Lyles underwent the ordered examination in August 2015 and complained of left knee pain and stiffness.

R. at 81.  The examiner found objective evidence of left knee pain on weight-bearing, localized tenderness, and crepitus on physical examination; range of motion tests revealed left knee extension from 130 to 10 degrees, with no additional limitation of motion or functional loss on repetition.  R. at 82.  The examiner stated, however, that he could not offer an opinion, without resort to mere speculation, as to whether pain, weakness, fatigability, or incoordination resulted in additional functional loss with repeated use over time because there was "[n]o objective evidence" relevant to that issue.  R. at 83.  He also indicated that "[n]o response [was] provided" regarding flare-ups, *id*., and that the overall severity of the veteran's left knee problems "is speculative," R. at 90.

In January 2016, the Board issued the decision currently on appeal, R. at 2-19.  The Board found that DC 5258 did not apply to the claim because the record did not reflect dislocation of semilunar cartilage; instead, it determined that DC 5259 applied because there was evidence of removal of semilunar cartilage.  R. at 12.  The Board acknowledged that the veteran experienced popping, locking, grinding, pain, swelling, looseness, and giving way or falling related to semilunar cartilage removal, but found that a separate evaluation under DC 5259 was not warranted because each of those symptoms was already "encompassed" by his current evaluations under DCs 5257 and 5261.  *Id*.  Specifically, the Board indicated that the veteran's pain, swelling, looseness, and giving way or falling had been attributed to left knee lateral instability and were the very symptoms that formed the basis for the 30% evaluation under DC 5257.  *Id*.  Similarly, the Board found that, because popping, grinding, and locking were symptoms of impaired motion, they were contemplated in the evaluation criteria for DC 5261 and had already "been considered in conjunction with the potential further impairment of motion" pursuant to *DeLuca*.  R. at 13.  The Board's *DeLuca* analysis consists primarily of its observation that there was "no clinical evidence that the [v]eteran has further range of motion impairment due to fatigability, incoordination, pain, or flare-ups, and the April 2010 and August 2015 examiners both commented that they could not say without resort to speculation what such impairment would be."  R. at 16.  Ultimately, the Board concluded that a separate left knee evaluation under DC 5259 would constitute impermissible pyramiding and denied the claim.  *Id*.  This appeal followed.

4

## II.  THE PARTIES' ARGUMENTS

In his briefs, Mr. Lyles argued that the Board clearly erred in finding that his 30% evaluations under DCs 5257 and 5261 encompassed all manifestations of his service-connected meniscal disability—namely, popping, locking, grinding, pain, and swelling—because the plain language of those DCs reflects that they cover only instability and limitation of leg extension, respectively.  He therefore asserted that he has not yet been compensated for the full extent of his service-connected left knee impairment and that a separate evaluation under either DC 5258 or 5259 is necessary to adequately account for those unaddressed manifestations. [4]  Appellant's Brief (Br.) at 8-13; Reply Br. at 1-4.[5]  The Secretary responded that the Board properly found, consistent with VA's interpretation of the scope of DCs 5257 through 5261 as set forth in the *VA Adjudication Procedures Manual* (M21-1), that all manifestations of the veteran's left knee meniscal disability were accounted for in his 30% evaluations under DCs 5257 and 5261 and that evaluating those manifestations again under a different DC would constitute impermissible pyramiding.  Secretary's Br. at 11-16 (citing M21-1, pt. III, subpt. iv. ch. 4, §§ A.4.i-j).

Mr. Lyles pivoted slightly at oral argument, conceding that VA may consider knee pain, swelling, popping, locking, and grinding when assigning a limitation-of-motion evaluation under DC 5261 pursuant to *DeLuca*.  He argued, however, that those manifestations of his service-connected meniscal disability had not been "compensated" in this case because the Board's *DeLuca* analysis had not resulted in an elevation of his 30% evaluation under DC 5261, meaning that evaluation of those manifestations under either DC 5258 or 5259 would not constitute pyramiding.  Oral Argument at 8:40-17:20.  The Secretary disagreed, asserting that the veteran's left knee pain, swelling, popping, locking, and grinding had already been considered under DC 5261 and could

---

[4] Although the Secretary urged the Court not to entertain any argument pertaining to a separate evaluation under DC 5258 because Mr. Lyles did not challenge the Board's finding that the record reflected only removal, but not dislocation, of left knee semilunar cartilage, Secretary's Br. at 10-11, the veteran's principal brief contains numerous allegations that the Board erred in denying a separate evaluation under DC 5258, *see, e.g.*, Appellant's Br. at 1, 7-13, and his reply brief explicitly challenged the Board's finding in that regard, Reply Br. at 1-2.  Accordingly, the Court concludes that the veteran's arguments encompass entitlement to a separate evaluation under either DC 5258 or 5259.

[5] Mr. Lyles also argued that the Board erred in not assigning a separate evaluation under DC 5258 or 5259 because, during a prior appeal to this Court, the Secretary conceded, R. at 292, and the Court agreed, R. at 318, that the Board had provided inadequate reasons or bases for its decision in failing to address potential entitlement to a separate evaluation under those DCs.  Appellant's Br. at 9; Reply Br. at 2.  The Board remedied that specific reasons-or-bases error in the decision currently on appeal by considering the potential applicability of DCs 5258 and 5259.  R. at 12-13.  Contrary to the veteran's contention, neither the Secretary's concession nor the Court's conclusion in the prior appeal compelled an award of a separate evaluation under DC 5258 or 5259.

5

not be considered again under DC 5258 or 5259, even though after considering those factors the Board held that they did not lead to elevation of the evaluation under DC 5261 pursuant to *DeLuca*. *Id.* at 51:09-51:40.

## III.  ANALYSIS

### A.  The Relevant DCs

Before addressing the parties' arguments, it is necessary to review the DCs involved in this appeal.  Mr. Lyles is currently in receipt of a 30% evaluation under DC 5257, which provides:

Knee, other impairment of:
Recurrent subluxation or lateral instability:

| | |
|---|---|
| Severe | 30 |
| Moderate | 20 |
| Slight | 10 |

38 C.F.R. § 4.71a, DC 5257 (2017).  He has also been assigned a 30% evaluation under DC 5261, which provides:

Leg, limitation of extension of:

| | |
|---|---|
| Extension limited to 45° | 50 |
| Extension limited to 30° | 40 |
| Extension limited to 20° | 30 |
| Extension limited to 15° | 20 |
| Extension limited to 10° | 10 |
| Extension limited to 5° | 0 |

38 C.F.R. § 4.71a, DC 5261.

Mr. Lyles is seeking a separate evaluation under either DC 5258 or 5259; the former provides a 20% evaluation for "Cartilage, semilunar, dislocated, with frequent episodes of 'locking,' pain, and effusion into the joint," whereas the latter provides a 10% evaluation for "Cartilage, semilunar, removal of, symptomatic."  38 C.F.R. § 4.71a, DCs 5258, 5259.

### B.  Availability of a Separate Meniscal Evaluation

We now turn to the primary legal issue presented in the parties' briefs:  Does evaluation of a knee disability under DC 5257 or 5261 preclude, as a matter of law, separate evaluation of a meniscal disability of the same knee under DC 5258 or 5259?  We hold that it does not.

Ordinarily, all disabilities—including those arising from a single disease entity—are to be evaluated separately.  38 C.F.R. § 4.25(b) (2017) ("Except as otherwise provided in this schedule, the disabilities arising from a single disease entity . . . are to be rated separately as are all other disabling conditions, if any.").  The individual evaluations are then combined in the manner

6

prescribed in the combined ratings table to determine the veteran's overall impairment in earning capacity, with combined evaluations corresponding to different statutory amounts of monthly disability compensation. 38 C.F.R. § 4.25; *see Amberman v. Shinseki*, 570 F.3d 1377, 1380-81 (Fed. Cir. 2009) (describing the mechanics of combined evaluation under § 4.25); *see also* 38 U.S.C. § 1114 (setting forth the monthly rates of wartime disability compensation); 38 U.S.C. § 1155 (instructing that percentage evaluations in the rating schedule "be based, as far as practicable, upon the average impairments of earning capacity resulting from such injuries in civil occupations"); 38 C.F.R. § 4.1 (2017) (implementing regulation for section 1155).

One regulatory exception to the general rule that separate disabilities are to be evaluated separately is VA's anti-pyramiding provision, which provides that "evaluation of the same disability under various diagnoses"—including "evaluation of the same *manifestation* under different diagnoses"—"is to be avoided." 38 C.F.R. § 4.14 (2017) (emphasis added); *see Amberman*, 570 F.3d at 1380 (noting this "exception to the ordinary process of separately rating and then combining ratings").

The rationale for the prohibition on pyramiding is that "the rating schedule may not be employed as a vehicle for compensating a claimant twice (or more) for the same symptomatology" because "such a result would overcompensate the claimant for the actual impairment" in earning capacity suffered. *Brady v. Brown*, 4 Vet.App. 203, 206 (1993); *see Amberman*, 570 F.3d at 1380-81 ("VA regulations caution against making multiple awards for the same physical impairment simply because that impairment could be labeled in different ways. It is the veteran's overall disability that is relevant, not the name of the causative disorder or disorders." (internal citation omitted)). "Of course, it is possible for a veteran to have separate and distinct manifestations attributable to two different disability ratings, and, in such a case, the veteran should be compensated under different diagnoses." *Fanning v. Brown*, 4 Vet.App. 225, 230 (1993).

The crux of the Secretary's argument that, as a matter of law, evaluation under DC 5257 or 5261 precludes separate evaluation under DC 5258 or 5259, and vice versa, is that the meniscal DCs are so broadly drawn that they necessarily encompass recurrent subluxation, lateral instability, and limitation of motion, such that evaluation under DC 5257 or 5261 and DC 5258 or 5259 would necessarily result in duplicate compensation of the same manifestations of knee disability in violation of § 4.14. Secretary's Br. at 15-16; *see* M21-1, pt. III, subpt. iv. ch. 4, § A.4.i (directing adjudicators not to assign separate evaluations under DC 5261 and DC 5258 or 5259

7

because "LOM [(limitation of motion)] of the knee is contemplated by the meniscus DCs"); M21-1, pt. III, subpt. iv. ch. 4, § A.4.j (directing adjudicators not to assign separate evaluations under DC 5257 and DC 5258 or 5259 because "[t]he criteria for both of those codes"—i.e., DCs 5258 and 5259—"contemplate instability"). The Secretary's interpretation, however, is contrary to the plain meaning of § 4.71a and the Court therefore need not afford it any deference. *See Southall-Norman v. McDonald*, 28 Vet.App. 346, 352-54 (2016) (rejecting the Secretary's interpretation of a regulation because it was contrary to the regulation's plain language); *Tropf v. Nicholson*, 20 Vet.App. 317, 320 (2006) (explaining that, when "the meaning of the regulation is clear from its language, then that is 'the end of the matter'" and deference to the agency's position is not warranted (quoting *Brown v. Gardner*, 513 U.S. 115, 120 (1994))); *see also Petitti v. McDonald*, 27 Vet.App. 415, 422 (2015) ("Regulatory interpretation begins with the language of the regulation, the plain meaning of which is derived from its text and its structure.").

Significantly, § 4.71a does not expressly prohibit separate evaluation under DC 5257 or 5261 and a meniscal DC. *See Esteban v. Brown*, 6 Vet.App. 259, 261 (1994) (examining three scar DCs and concluding that separate evaluation under each of the DCs was available because "none of the three DCs in question provide[s] that a veteran may not be rated separately for the described conditions"); *see also Yonek v. Shinseki*, 722 F.3d 1355, 1358 (Fed. Cir. 2013) (examining a musculoskeletal DC to assess whether separate evaluation was permitted and noting that "nothing in the remainder of [§] 4.71a suggests that [the DC] does not mean what it says"). As outlined above, § 4.25(b) directs adjudicators to evaluate each disability separately, "[e]xcept as otherwise provided in [the rating] schedule," and § 4.14 recognizes that "[d]isability from injuries to the muscles, nerves, and joints of an extremity may overlap to a great extent, so that special rules are included in the appropriate bodily system for their evaluation."

The rating schedule is replete with rules that prohibit separate evaluation of other disabilities. *See, e.g.*, 38 C.F.R. § 4.96(a) (2017) (forbidding separate evaluation of coexisting respiratory conditions and directing that "[a] single rating will be assigned under the [DC] which reflects the predominant disability with elevation to the next higher evaluation where the severity of the overall disability warrants such elevation"); 38 C.F.R. § 4.97, Note 3 to DC 6845 (2017) (providing, for evaluations under the General Rating Formula for Restrictive Lung Disease, that "[i]nvolvement of Muscle Group XXI (DC 5321) . . . will not be separately rated"); 38 C.F.R. § 4.104, Note 2 to DC 7101 (2017) ("Evaluate hypertension due to aortic insufficiency or

8

hyperthyroidism, which is usually the isolated systolic type, as part of the condition causing it rather than by a separate evaluation."); 38 C.F.R. § 4.113 (2017) (noting that "[t]here are diseases of the digestive system, particularly within the abdomen, which, while differing in the site of pathology, produce a common disability picture characterized in the main by varying degrees of abdominal distress or pain, anemia and disturbances in nutrition" and cautioning that "certain coexisting diseases in this area . . . do not lend themselves to distinct and separate disability evaluations without violating the fundamental principle relating to pyramiding as outlined in § 4.14"); 38 C.F.R. § 4.114 (2017) ("Ratings under [DCs] 7301 to 7329, inclusive, 7331, 7342, and 7345 to 7348 inclusive will not be combined with each other. A single evaluation will be assigned under the [DC] which reflects the predominant disability picture, with elevation to the next higher evaluation where the severity of the overall disability warrants such elevation."); 38 C.F.R. § 4.115 (2017) ("Separate ratings are not to be assigned for disability from disease of the heart and any form of nephritis, on account of the close interrelationships of cardiovascular disabilities.").

Yet, the Secretary declined to include a similar prohibition against separate evaluation in the portion of § 4.71a governing evaluation of the knees. Given that the Secretary has repeatedly demonstrated that he knows how to craft regulations that expressly forbid separate evaluation of other disabilities, the lack of an express bar to separate evaluation of knee disabilities in § 4.71a must be read as a deliberate decision to permit separate evaluation. *See Yonek*, 722 F.3d at 1359 ("'Where an agency includes particular language in one section of a regulation but omits it in another, . . . it is generally presumed that the agency acts intentionally and purposely in the disparate inclusion or exclusion.'" (brackets omitted) (quoting *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993))); *see also Jones v. Shinseki*, 26 Vet.App. 56, 62 (2012) (holding that the Secretary's "failure to include the effects of medication as a criterion [in a particular DC] while including such effects as criteria under other DCs must [] be read as a deliberate choice"); *Buczynski v. Shinseki*, 24 Vet.App. 221, 227 (2011) (explaining that the Secretary's omission from a DC of a limitation included in other DCs was an important factor in determining the plain meaning of the DC); *Tropf*, 20 Vet.App. at 321 n.1 ("[W]hen a statute or regulation omits a term in one place that is used in other places, that omission should be regarded as intentional and given effect.").

9

The history of § 4.71a confirms this interpretation. Since its inception in 1921, the rating schedule has included separate provisions for evaluating knee instability, limitation of leg extension, and meniscal problems. *See, e.g.*, 1921 SCHEDULE FOR RATING DISABILITIES at 42-43. However, at no point in its 96-year history has the portion of the rating schedule pertaining to the knees included an express prohibition on separate evaluation of those manifestations of disability, despite numerous amendments. *See id.*; 1925 SCHEDULE FOR RATING DISABILITIES at 47; 1933 SCHEDULE FOR RATING DISABILITIES, DCs 1814, 1818, 3156-57; 1945 SCHEDULE FOR RATING DISABILITIES, DCs 5257-59, 5261; 38 C.F.R. § 4.71a, DCs 5257-59, 5261 (1965–present).

The language and history of § 4.71a and the text of the surrounding provisions of the rating schedule unambiguously reflect that evaluation of a knee disability under DC 5257 or 5261 does not preclude, as a matter of law, separate evaluation of a meniscal disability of the same knee under DC 5258 or 5259. Nor does evaluation of a meniscal disability under DC 5258 or 5259 preclude, as a matter of law, separate evaluation of a different disability of the same knee under DC 5257 or 5261.[6] Therefore, the Court will not defer to the Secretary's interpretation of those DCs set forth in M21-1, pt. III, subpt. iv. ch. 4, §§ A.4.j-i, and will not read into § 4.71a a prohibition on separate evaluation under those DCs that contravenes the plain meaning of that regulation. *See Southall-Norman*, 28 Vet.App. at 352 (concluding that a regulation was clear on its face and rejecting "the Secretary's attempts to read into the regulation a limitation to its applicability that is simply not there"); *Ortiz-Valles v. McDonald*, 28 Vet.App. 65, 71 (2016) (declaring that "[t]he Secretary cannot simply add restrictions to a regulation where they do not exist"); *Burton v. Shinseki*, 25 Vet.App. 1, 5 (2011) (declining to infer a limitation from the text of 38 C.F.R. § 4.59); *cf. Bates v. United States*, 522 U.S. 23, 29 (1997) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face.").

### C. Overlapping or Duplicative Manifestations of Disability

Having concluded that evaluation of a knee disability under DCs 5257 or 5261 or both does not, as a matter of law, preclude separate evaluation of a meniscal disability of the same knee under DC 5258 or 5259, and vice versa, we now address the primary issue raised at oral argument: Have the symptoms of Mr. Lyles's left knee disabilities already been compensated under DCs 5257 and

---

[6] Although not raised by the facts of this case, the foregoing analysis yields the same result for evaluation under 38 C.F.R. § 4.71a, DC 5260 (Limitation of leg flexion)—namely, that evaluation of a knee disability under DC 5260 does not preclude, as a matter of law, separate evaluation of a meniscal disability of the same knee under DC 5258 or 5259, and vice versa.

5261 such that separate evaluation under DC 5258 or 5259 is not warranted on the facts of this case?

The Board concluded that Mr. Lyles's manifestations of left knee meniscus disability—popping, locking, grinding, pain, swelling, looseness, and giving way or falling, R. at 12—were not subject to separate evaluation under a meniscus DC because those manifestations had "already been considered by the ratings assigned under [DCs] 5257 and 5261," R. at 13. Specifically, the Board found that the manifestations of pain, swelling, looseness, and giving way or falling had "been attributed to [the veteran's] left knee lateral instability" and "form[ed] the very basis" of his 30% evaluation under DC 5257. R. at 12. The Board also determined that the manifestations of popping, locking, and grinding were "contemplated" by his evaluation under DC 5261 and their impact on his range of motion had "been considered [under that DC] in conjunction with the potential further impairment of motion due to factors such as pain, weakness, lack of endurance[,] and fatigability" pursuant to *DeLuca*. R. at 13. This analysis, however, cannot be sustained on the record on appeal.

### 1. Manifestations of Left Knee Disability Compensated Under DC 5257

The Board first erred in finding that evaluation under DC 5257 compensated Mr. Lyles for manifestations of knee disability other than recurrent subluxation and lateral instability, such as pain and swelling.[7] As the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) explained in *Delisle v. McDonald*, 789 F.3d 1372, 1375 (Fed. Cir. 2015), "DC 5257 is unambiguous; by its plain language, it provides compensation for veterans suffering from impairments of the knee, other than those enumerated elsewhere in the relevant regulations, that cause the symptoms of recurrent subluxation or lateral instability." In so holding, the Federal Circuit expressly rejected the veteran's argument in that case that DC 5257 should be read to include manifestations of knee disability other than recurrent subluxation or lateral instability, concluding that "DC 5257 is limited to establishing compensation for disabilities causing such specifically enumerated symptoms." *Id.*

VA's General Counsel came to a similar conclusion nearly two decades earlier, finding that DC 5257 expressly covered evaluation of recurrent subluxation and lateral instability of the knee

---

[7] The Board also found that evaluation under DC 5257 compensated the veteran for looseness and giving way/falling. R. at 12. Mr. Lyles did not challenge the Board's finding in this regard, but rather conceded that such manifestations were "correctly rated" under that DC. Appellant's Br. at 10. The Court expresses no opinion as to the correctness of that concession.

11

"without reference" to any other manifestations. VA Gen. Coun. Prec. 23-97 (July 1, 1997). Although the General Counsel recognized that "a given [DC] need not include an exhaustive list of symptomatology," he cautioned that "the use of unspecified criteria for rating purposes could produce inconsistent evaluations due to lack of guidance to rating personnel." *Id*. That is precisely what occurred here.

By concluding that Mr. Lyles's 30% evaluation under DC 5257 compensated him for pain and swelling, manifestations other than recurrent subluxation or lateral instability, the Board read into the DC nonexistent evaluation criteria that foreclosed the possibility of separate evaluation under a meniscal DC. *See Bankhead v. Shulkin*, 29 Vet.App. 10, 22 (2017) (concluding that the Board "erred in applying a standard that exceeded that set forth in the relevant evaluation criteria"); *Pernorio v. Derwinski*, 2 Vet.App. 625, 628 (1992) (same). That finding is directly contrary to the Federal Circuit's holding in *Delisle* and the General Counsel's guidance in Precedent Opinion 23-97, which is binding on the Board. 38 U.S.C. § 7104(c); *Hornick v. Shinseki*, 24 Vet.App. 50, 52 (2010). Because DC 5257 compensates veterans only for knee impairment resulting in recurrent subluxation and lateral instability, the Board's finding that Mr. Lyles's 30% evaluation under DC 5257 also compensated him for pain and swelling must be reversed. *See Drosky v. Brown*, 10 Vet.App. 251, 255 (1997) (reversing a Board finding as legally erroneous that was based on factors outside and in excess of the evaluation criteria); *Massey v. Brown*, 7 Vet.App. 204, 207-08 (1994) (reversing a Board finding that was based on factors "almost entirely" outside the evaluation criteria). As the VA General Counsel has advised, VA raters and Board members should avoid assigning a musculoskeletal evaluation to compensate for factors not covered in the DC under which evaluation is made. *See* VA Gen. Coun. Prec. 23-97.

### *2. Manifestations of Left Knee Disability Compensated Under DC 5261*

This is not the end of the matter, however, because the foregoing error may be rendered harmless by a finding that all the manifestations of Mr. Lyles's left knee meniscus disability, including pain and swelling, were compensated by his 30% evaluation under DC 5261, thereby precluding separate evaluation of those manifestations under a meniscus DC. *See* 38 U.S.C. § 7261(b)(2) (requiring the Court to "take due account of the rule of prejudicial error"); *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (explaining that "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination"). That is not the case here.

12

Part 4 of Title 38 of the Code of Federal Regulations contains the regulatory tools for evaluating musculoskeletal disabilities such as Mr. Lyles's service-connected left knee disabilities. It is comprised, in pertinent part, of the rating schedule for "The Musculoskeletal System," 38 C.F.R. §§ 4.40-4.73, and prescriptive regulations—including 38 C.F.R. §§ 4.40, 4.45, and 4.59—that "explain how to arrive at proper evaluations under the DCs appearing [therein]," *Petitti*, 27 Vet.App. at 424. Using these tools, an adjudicator may craft, in recognition of and deference to the foregoing regulations, a higher musculoskeletal evaluation than would otherwise be supported by mechanical application of a given DC. *See Sharp v. Shulkin*, 29 Vet.App. 26, 31-32 (2017).

This can happen in one of three ways. A veteran's evaluation may be elevated to a higher level where there is evidence that a service-connected musculoskeletal disability causes either (1) additional functional loss—i.e., "the inability . . . to perform the normal working movements of the body with normal excursion, strength, speed, coordination[,] and endurance"—including as due to pain and/or other factors, 38 C.F.R. § 4.40 (2017); or (2) reduction of a joint's normal excursion of movement in different planes, including changes in the joint's range of movement, strength, fatigability, or coordination, 38 C.F.R. § 4.45 (2017). *See Mitchell v. Shinseki*, 25 Vet.App. 32, 36-37 (2011); *DeLuca*, 8 Vet.App. at 205-07. Elevation of a veteran's musculoskeletal disability under either of these methods, colloquially known as the *DeLuca* factors, is based on additional functional loss with use or during flare-ups, which should, if feasible, be portrayed in terms of the degree of additional range-of-motion lost. *DeLuca*, 8 Vet.App. at 206. Alternatively, a veteran (3) may be awarded the minimum compensable evaluation available under a given musculoskeletal DC, even if application of that DC would not support a compensable evaluation, where there is evidence of "actually painful, unstable, or malaligned joints." 38 C.F.R. § 4.59 (2017); *see Southall-Norman*, 28 Vet.App. at 352; *Petitti*, 27 Vet.App. at 425.

When evaluating disabilities, including musculoskeletal disabilities, the aim of the rating schedule is to ensure that a claimant is properly compensated, but not overcompensated, for the actual level of impairment. *See Amberman*, 570 F.3d at 1380-81; *Brady*, 4 Vet.App. at 206. To that end, VA regulation prohibits duplicate compensation for the same manifestation of disability under different diagnoses. *Brady*, 4 Vet.App. at 206; 38 C.F.R. § 4.14; *see generally Boggs v. Peake*, 520 F.3d 1330, 1337 (Fed. Cir. 2008) ("[A] veteran cannot be compensated more than once

13

for the same disability.").  It follows that, where a certain manifestation of a disability has not been compensated via an assigned evaluation under a particular DC, evaluation of that manifestation under another DC would not constitute pyramiding.  *See Fanning*, 4 Vet.App. at 230.  A manifestation of disability has not been compensated by an assigned evaluation if the manifestation is "distinct and separate" from the manifestations that form the basis of the assigned evaluation. *Murray v. Shinseki*, 24 Vet.App. 420, 423 (2011) (explaining that separate knee evaluations may be warranted where "the appellant's symptoms are distinct and separate" (internal quotation omitted)).

Although the Court in *Esteban* broadly stated that the critical element for separate evaluation is that none of the symptoms for any one of the three facial injury residuals at issue in that case was duplicative of or overlapping with the symptoms of the other two conditions, 6 Vet.App. at 262, the pyramiding inquiry does not end with whether two disabilities share a common manifestation, but continues to inquire whether that common manifestation would be improperly compensated more than once. This understanding was further expressly endorsed by the Secretary in General Counsel Precedent Opinion 9-2004, which concluded, citing *Esteban*, that limitation of leg flexion and extension of the same knee "must be rated separately [under DCs 5260 and 5261, respectively,] to adequately *compensate* for functional loss associated with injury to the leg," even where pain is present during both motions.  VA Gen. Coun. Prec. Op. 9-2004 (Sept. 17, 2004) ("[T]he key consideration in determining whether rating under more than one [DC] is in order is whether the *ratings* under different [DCs] would be based on the same manifestation of disability or whether none of the symptomatology upon which the separate *ratings* would be based is duplicative or overlapping.") (emphasis added). As relevant here, where manifestations of a musculoskeletal disability causing additional functional limitation have not resulted in elevation of the evaluation pursuant to *DeLuca*, those manifestations have not yet been compensated for separate evaluation and pyramiding purposes.

Mr. Lyles conceded at oral argument, and the Court agrees, that each of the manifestations of his left knee meniscus disability not compensated by DC 5257—i.e., pain, swelling, popping, locking, and grinding—could be compensated under DC 5261 pursuant to *DeLuca*.  Oral Argument at 13:08-17:20.  Indeed, § 4.40 recognizes that functional loss "may be due to pain" and § 4.45(f) expressly lists pain on movement and swelling as "related considerations" for evaluating joint disabilities.  Although neither regulation explicitly mentions popping, locking, or grinding,

to the extent that those manifestations cause "disturbances of locomotion" or "interference with sitting, standing[,] and weight-bearing," they too are contemplated by § 4.45(f).[8]

Notwithstanding that pain, swelling, popping, locking, and grinding *could* be compensated under DC 5261, the Board's reasons or bases for denying a higher left knee evaluation under DC 5261 reveal that those manifestations have not yet been compensated in this case. The Board noted that the April 2010 VA examiner had found that the veteran's left leg extension was limited to 20 degrees and that the record did not contain clinical evidence of any greater limitation of extension. R. at 16. Based on the demonstrated limitation of extension, it concluded that a 30% evaluation was appropriate under DC 5261 before considering the *DeLuca* factors. *Id*.

The Board then considered §§ 4.40 and 4.45 and explained that there was "no clinical evidence that the [v]eteran has further range of motion impairment due to fatigability, incoordination, pain, or flare-ups" because the April 2010 and August 2015 VA examiners "both commented that they could not say without resort to speculation what such impairment would be." *Id*. The Board noted the veteran's lay complaints of additional limitation of motion due to pain, but found that they were outweighed by unidentified clinical evidence, presumably, the April 2010 and August 2015 examiners' opinions that any additional functional limitation could not be quantified without resort to speculation. *Id*. Ultimately, the Board concluded that, "[w]ithout clinical medical evidence indicating such additional functional limitation, the Board is unable to find that the [v]eteran's pain is so disabling as to actually or effectively limit . . . extension of the left knee to such an extent as to warrant assignment of higher ratings." R. at 17. This analysis is inadequate in several respects, frustrating judicial review of whether, for separate evaluation purposes, Mr. Lyles's current 30% evaluation under DC 5261 compensated him for the pain, swelling, popping, locking, and grinding associated with his left knee meniscal disability.

First, the Board focused solely on whether pain caused additional functional limitation sufficient to warrant an elevation of compensation under DC 5261 without discussing Mr. Lyles's other manifestations of left knee meniscal disability that may be covered by § 4.45. *See* R. at 16-17. The Board's failure to address whether swelling, popping, locking, or grinding caused additional functional limitation that would result in an elevation of his 30% evaluation under DC

---

[8] Similarly, insofar as popping and grinding may be consistent with crepitus, those manifestations are contemplated by § 4.59.

5261 pursuant to *DeLuca* rendered inadequate its reasons or bases for finding that all the manifestations of his left knee meniscal disability had been compensated by the currently assigned evaluations.[9] *See DeLuca*, 8 Vet.App. at 207-08 (concluding that the Board provided inadequate reasons or bases for its decision where it failed to properly consider § 4.40 in evaluating a musculoskeletal disability).

Second, the Board's reliance on the April 2010 and August 2015 VA examiners' statements that they could not opine as to the presence and degree of any additional functional limitation during left knee flare-ups without resort to mere speculation violated the Court's recent holding in *Sharp*. In that case, a VA medical examiner indicated that it was not possible to estimate the extent of any additional functional loss during flare-ups of upper extremity disabilities without resorting to speculation because there was "no conceptual or empirical basis for making such a determination without directly observing function" during a flare-up, and the Board relied on that statement to deny higher upper extremity evaluations based on the *DeLuca* factors. 29 Vet.App. at 30. On appeal, the Court set aside the Board decision and remanded the musculoskeletal claims for another VA medical examination because the examiner had not elicited from the veteran a description of his functional limitations during flare-ups and it was not clear from the examination report whether the examiner's inability to opine on that matter was the result of all procurable medical evidence or her individual inability to provide the requested opinion. *Id*. at 34-37.

The April 2010 and August 2015 VA examination reports in this case suffer from the same deficiencies as the VA examination report at issue in *Sharp*. Like the examiner in *Sharp*, the April 2010 VA examiner in Mr. Lyles's case indicated that he could not quantify the extent of any additional functional limitation during flare-ups without resorting to speculation because he had not observed a flare-up during the examination, R. at 703, even though he had earlier noted the veteran's reports of additional impairment during flare-ups, R. at 696. The August 2015 VA examiner expressed a similar sentiment, noting that there was "[n]o objective evidence" pertinent to additional functional limitation with repeated use over time, that "[n]o response [was] provided" regarding flare-ups, and that any opinion as to the extent of the severity of the veteran's left knee problems in such situations would be "speculative." R. at 83, 90. As in *Sharp*, the examiners' statements in this case reflect personal reluctance to offer the medical opinions necessary for

---

[9] To avoid this problem, raters should clarify the specific *DeLuca* factors, i.e., pain, swelling, et cetera, that form the basis of any elevated evaluation.

16

proper evaluation of a musculoskeletal disability in accordance with *DeLuca*, rather than a limitation of knowledge in the medical community at large. 29 Vet.App. at 36 (explaining that, "before the Board can accept an examiner's statement that an opinion cannot be provided without resort to speculation, it must be clear that this is predicated on a lack of knowledge among the 'medical community at large' and not the insufficient knowledge of the specific examiner" (quoting *Jones v. Shinseki*, 23 Vet.App. 382, 390 (2010))). The Board's failure to address that deficiency in the April 2010 and August 2015 VA examinations thus rendered inadequate its discussion of the effect of the *DeLuca* factors on the veteran's current 30% evaluation under DC 5261. *Id*. at 33; *Jones*, 23 Vet.App. at 392.

Given the foregoing, it is clear that the Board has not yet properly assessed whether Mr. Lyles's pain, swelling, popping, locking, and grinding associated with his left knee meniscal disability have been compensated by his current left knee evaluations under DC 5261. Remand of the veteran's left knee meniscal disability claim is therefore warranted to determine whether separate evaluation of a meniscal disability under either DC 5258 or 5259 is warranted on the facts of this case or whether such evaluation would constitute impermissible pyramiding. *See Tucker v. West*, 11 Vet.App. 369, 374 (1998) (holding that remand is the appropriate remedy "where the Board has incorrectly applied the law, failed to provide an adequate statement of reasons or bases for its determinations, or where the record is otherwise inadequate"). The veteran is free on remand to present any additional arguments and evidence pertinent to this issue to the Board in accordance with *Kutscherousky v. West*, 12 Vet.App. 369, 372-73 (1999) (per curiam order). *See Kay v. Principi*, 16 Vet.App. 529, 534 (2002). The Court reminds the Board that "[a] remand is meant to entail a critical examination of the justification for [the Board's] decision," *Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991), and must be performed in an expeditious manner in accordance with 38 U.S.C. § 7112.

### III. CONCLUSION

Upon consideration of the foregoing, the Board's finding that the veteran's pain and swelling associated with his left knee meniscal disability were compensated by his 30% evaluation under DC 5257 is REVERSED; the portion of the January 14, 2016, Board decision denying entitlement to a separate left knee evaluation based on locking or other manifestations of the

semilunar cartilage is SET ASIDE; and that matter is REMANDED for further development and readjudication consistent with this decision.  The balance of the appeal is DISMISSED.